Andres Jesse **GARZA** et al., Appellants,

v.

**WACO SCAFFOLD AND SHORING COMPANY, Appellee.**

No. 6709.

Court of Civil Appeals of Texas, El Paso.

Dec. 13, 1978.

Rehearing Denied Jan. 3, 1979.

---

Malcolm McGregor, Inc., Malcolm McGregor, Philip T. Cole, Janet Ruesch, El Paso, for appellants.

Dudley & Dudley, William C. Dudley, Robert A. Skipworth, El Paso, for appellee.

## OPINION

WARD, Justice.

This is a strict tort liability action involving a design defect. Three workmen were injured when shoring which had been leased from the Defendant by their employer gave way and large bridge beams upon which they were working fell. Trial was to a jury which failed to find that a design defect was present in the shoring. Based on the jury verdict, a take nothing judgment was entered. The Plaintiffs appeal and we affirm.

The three Plaintiffs were employed by Southwestern Industrial Contractors and Riggers, which was one of the contractors in the building of an interchange on Interstate Highway No. 10 in El Paso. Work was in progress in the construction of a bridge on the interchange, and six large steel girders had been placed on their permanent support at their west end, but were being supported at their east end by shoring which had been built up to some fifty feet in height. The shoring had been rented by the contractor from the Defendant, Waco Scaffold and Shoring Company. The shoring was being used by the contractor to erect four towers as the temporary supports or shoring for raising the large girders to their permanent support. On April 20, 1972, while the Plaintiffs were working on the girders, the supporting shoring collapsed and the men were thrown to the ground and seriously injured.

Upon the trial of the case, the Plaintiffs' theory of liability was developed, and it was to the effect that the shoring was defective because swivel jacks which were at the top of the shoring columns permitted a rotating movement to occur to the cribbage or carriage which supported the large girders. This caused a lateral movement to occur to the load, and this in turn caused the successive collapse of the cribbage and of the shoring. The Plaintiffs' testimony was further to the effect that the design of the swivel jacks at the top of the shoring was defective as a locking device should have been built into them to prevent any lateral movement from occurring when a load was put on top of the columns. The theory of the Defendant was that it rented the shoring only and that a contractor such as Southwestern Industrial Contractors and Riggers, when it was handling the large bridge beams, had to design and properly construct the cribbage or cradles which were placed atop of the shoring and which were designed to directly support the large bridge beams so that the load could be evenly and safely distributed to the legs of the shores; that the cribbage itself was improperly designed and constructed as it was without lateral bracing, and as a result certain of the cribbage beams collapsed under the large load and in turn caused the shoring to collapse.

In the first special issue submitted, the Court inquired of the jury if the failure of Waco to provide a locking mechanism in the swivel base jack assembly at the top of the shores rendered the shoring leased by Waco to Southwestern defective. The jury was instructed that a product is defective if the product exposes its user to an unreasonable risk of harm when used for the purpose for which it was intended. Unreasonable risk of harm meant that the article leased must be dangerous to an extent beyond that which would be contemplated by the ordinary user who leases it with the ordinary knowledge common to the community as to its characteristics.

■ The Plaintiffs requested of the Court the submission of the following issue as Special Issue No. 1:

"Do you find from a preponderance of the evidence that the swivel devices in the top of the Super X Shoring delivered by the defendant, Waco Scaffold and Shoring Company, permitted lateral movement?"

The Plaintiffs then requested Special Issue No. 2 be submitted in the form which asked if:

" * * * the lateral movement permitted by the swivel devices in the top of the Super X Shoring delivered by the Defendant, Waco Scaffold and Shoring Company, rendered such shoring defective as herein defined?"

The failure of the trial Court to submit the issues as requested is the subject of the Plaintiffs' first point which is to the effect that the inquiry by the Court regarding the Defendant's failure to provide a locking mechanism in the swivel base jack assembly at the top of the shores was evidentiary only and highly restrictive, and that the Plaintiffs were entitled to the general submission of whether the swivel devices permitted lateral movement and whether such lateral movement rendered the shoring defective. Rules 277 and 279, Tex.R.Civ.P., mandate that special issues be submitted only if raised by both the pleadings and the evidence. Rule 277, as presently revised, provides that it shall be discretionary with the Court whether to submit separate questions with respect to each element of a case or to submit issues broadly. It states that it will not be objectionable that a question is general or includes a combination of elements or issues. The problem presented to us is whether or not there has been a fair submission of the strict tort liability action of the claimed design defect under the pleadings and the evidence. We have no guide from the pleadings as they alleged a cause of action based solely on negligence and warranty, the evidence of strict liability having been introduced without objection and that theory developed by implied consent. The Plaintiffs argue that their expert's opinion was to the effect that the cause of the failure was because the swivel devices permitted lateral movement; that such a design was dangerous; and that the movement could be eliminated in any number of simple ways, including, among others, a locking device. After reading the evidence, we disagree. The expert found no fault in the lateral movement as such in the swivel devices. His complaint was that before the load was applied, the devices should be locked and he suggested the use of setscrews in each swivel. Apparently, the attorney for the Plaintiffs agreed with this interpretation as noted in his argument made against the Defendant's motion for instructed verdict. He there stated that the proof had shown that the swivel devices without the capacity of being locked were unreasonably dangerous. We hold that the trial Court's broad discretion in the submission of the special issue has not been abused and the first point is overruled.

While the Plaintiffs presented their theory of strict liability against the supplier for the design defect, the supplier relied upon misuse of the product by the contractor to defeat the claim. As pointed out, the misuse defense was that the contractor had designed and constructed a cribbage system that collapsed under the load, and which then permitted the load to fall through the shores to the ground. The trial Court submitted this defense by Special Issues Nos. 4 through 7, inclusive, which inquired wheth-

er the contractor, Southwestern, had failed to build an adequate cribbage system to hold the load; whether that failure was a misuse of the shores; and if the misuse was a proximate cause of the occurrence. Although the jury determined that Southwestern failed to build an adequate cribbage system by its answer to Special Issue No. 5, it failed to find that there was a misuse of the shores by Southwestern, and consequently did not reach the proximate cause issue. Special Issue No. 7, the last of the series of defensive issues, was conditionally submitted; that is, the jury was instructed to answer it only if an affirmative answer was made to Special Issues Nos. 3 and 6. Special Issue No. 3 was not answered, as the jury failed to find any defective shoring as contended by the Plaintiffs, and, as stated, Special Issue No. 6 was not answered as the jury had failed to find a misuse of the shores by Southwestern.

■ Contrary to the instruction, the jury answered Special Issue No. 7, the submission of which and the jury's answer being as follows:

"What percentage of the fault as found by your answers to Questions Nos. 1 and 5 do you find from a preponderance of the evidence to be attributable to each of the parties listed below? ANSWER BY STATING THE PERCENTAGE, IF ANY, OPPOSITE EACH NAME.

| | |
|---|---|
| WACO | 25% . |
| SOUTHWESTERN | 75% . |
| TOTAL | 100%" |

Apparently, the Defendant was attempting to use the misuse defense which reduces recovery under certain circumstances when it is a concurring cause as that reduction defense was originally developed in *General Motors Corporation v. Hopkins*, 548 S.W.2d 344 (Tex.1977). That defense should not have been applied in the present case. These Plaintiffs/workmen did not misuse the product. Further, they were covered by workmen's compensation benefits, and their possible recovery against the third-party supplier could not have been diluted had they established that the Defendant furnished a defective product which was a producing cause of their injury. Finally, the Defendant was statutorily prohibited by the Workmen's Compensation Act from recovery upon any theory of contribution or indemnity as against the employer unless so protected by the terms of a written contract. Tex.Rev.Civ.Stat.Ann. art. 8306, Sec. 3.

■ Regardless, the jury did answer Special Issue No. 7 as indicated, and this action becomes the subject of a series of the Plaintiffs' points, jury misconduct being the complaint made in the second point. Rule 327, Tex.R.Civ.P., requires that the Plaintiffs prove that an overt act of misconduct occurred, that it was material misconduct, and "from the record as a whole an injury probably resulted." *Fountain v. Ferguson*, 441 S.W.2d 506 (Tex.1969). It can be stated that misconduct did occur. Five jurors testified at the hearing on the motion for new trial, two being called by the Plaintiffs. The testimony of the jurors as a whole was to the effect that when they were either discussing, voting on or after completing their vote on Special Issue No. 7, the statement was made and a discussion occurred that Waco would pay 25% and Southwestern would pay 75% of the damages suffered by the Plaintiffs. The materiality of this misconduct and its probable harm is something else. The three jurors called by the Defendant testified that they first considered Special Issue No. 1, and after considerable discussion and voting they answered the issue "No," the vote being recorded as showing two dissents. Because they had been charged to render their verdict upon the vote of ten or more members, they proceeded to answer the balance of the questions. According to these jurors, the misconduct occurred when they reached and were discussing Special Issue No. 7; and that after completing the verdict, the foreman inquired of the jury if there remained any dissents, and no one answered to the contrary. The verdict was then signed by the foreman as being a unanimous one and was so received after the Court had inquired if it was their verdict. The two jurors called by the Plaintiffs testified to a

different version. They stated that a final vote was not taken on Question No. 1 before the misconduct occurred, and that the vote was either seven to five or nine to three on the issue and that they then moved on to Question No. 7 when the discussion occurred about the Plaintiffs being paid. It was after this that these two jurors and the other dissenters then changed their votes on Special Issue No. 1. The time during jury deliberations at which misconduct occurs is an important factor in determining the probability of injury. *Fountain v. Ferguson*, supra. Since there are no findings of fact, the trial Court presumably found all facts necessary to the support of its judgment. This would necessarily include the implied finding that the misconduct occurred as was testified to by the three jurors called by the Defendant. Under that version, the misconduct was immaterial and caused no harm since no more than two jurors changed their votes because of the comments. Rule 292, Tex.R.Civ.P.; *Tees v. Tees*, 546 S.W.2d 912 at 916 (Tex.Civ.App.—Houston [1st Dist.] 1977, no writ). The point is overruled.

■ The Plaintiffs assert that the trial Court was in error in not declaring a mistrial as the jury's answers to Special Issues Nos. 1, 5 and 7 create a fatal conflict. The trial Court has the duty to reconcile apparent conflicts in the jury's findings, if this can reasonably be done in the light of the pleadings and the evidence, the manner in which the issues were submitted, and in view of the other findings when considered as a whole. *Ford v. Carpenter*, 147 Tex. 447, 216 S.W.2d 558 (1949). The rule is established that a trial Court properly harmonizes any apparent conflict between a specific finding of no negligence as to a defendant in the liability issues and an apportionment of negligence in the subsequent comparative negligence issue when it enters a judgment for the defendant, the rule being that the specific finding directed toward the liability aspect of the verdict controls over the general finding of comparative negligence. *Tennessee Gas Pipeline Company v. Hartman*, 556 S.W.2d 616 (Tex. Civ.App.—Corpus Christi 1977, no writ);

*Ingles v. Cohen*, 543 S.W.2d 455 (Tex.Civ. App.—Waco 1976, writ ref'd n. r. e.). We adopt the reasoning applied to those negligence cases to the fact situation presently before the Court, and the point is overruled.

■ The Plaintiffs argue by their fifth point that if there was no fatal conflict, then they are entitled to judgment on the verdict based on the jury's answer to Special Issue No. 7. The Plaintiffs filed a motion to disregard the jury's answer to Special Issue No. 1 because the same was evidentiary and not a controlling issue. That contention has been disposed of when we overruled the Plaintiffs' first point. There was no fatal conflict since the specific finding on Special Issue No. 1 controls over the general finding in relation to the percentages of fault. That being the case, the trial Court had no other alternative but to enter judgment for the Defendant. *Tennessee Gas Pipeline Company v. Hartman*, supra. The point is overruled.

■ The final point to be discussed is the Plaintiffs' third point, which complains of the action of the trial Court in refusing the Plaintiffs' offer into evidence of the lease agreement made between Waco and Southwestern concerning the shores. The lease contained an alleged indemnity agreement in the following form:

> " * * * Lessee [Southwestern in this case] assumes all responsibility for claims asserted by any person whatever growing out of the erection, maintenance, use, operation or possession of said Goods and will hold Lessor harmless from all claims for liability to persons or property. * * "

Based on this indemnity agreement, Waco had impleaded Southwestern as a third-party Defendant praying for indemnity or contribution, and that third-party action had been severed from the instant case. A summary judgment had been entered in that third-party action in favor of the third-party Defendant, Southwestern. That judgment had not become final at the time of the present trial.

The materiality of the contract comes about as Waco, the Defendant in the present case, called as a witness George Hatch who testified before the jury that he was the executive vice president of Southwestern, and that he and his Company had direct responsibility for the cribbage system that was used on the job in question. He testified that the shoring system of the Defendant was adequate, that he found no fault with the shores provided by Waco, and that the fault was with his own Company's cribbage system and, finally, he testified that he personally accepted the responsibility for the accident. The lease contract was offered for the purpose of showing the bias or credibility of Mr. Hatch. The trial Court expressed its concern as to the jury's possible speculations as to whether or not Southwestern would actually be liable to Waco in the third-party action and ruled that it would not permit the introduction into evidence of the indemnity agreement between the parties, but would permit the introduction into evidence of the fact that the lawsuit was existing between the two Companies. Pursuant to this, Hatch testified on cross-examination that his Company's insurance carrier lawyer was representing Southwestern in that indemnity litigation; that Hatch knew that a legal dispute developed between Waco Scaffolding and his firm concerning Southwestern being financially responsible to pay the damages in the present case; and that the legal dispute was one in which Waco was saying that if it should lose the present case, Southwestern Industrial Contractors and Riggers, Inc. would be the one to pay the damages that might be awarded by the jury to the Plaintiffs in the present case.

The Plaintiffs argue that they were entitled to present the written signed contract before the jury as it would more effectively show the bias of Mr. Hatch and his concern for his Company; that it was not a question of what the ultimate liability of Southwestern would be to Waco, but was a question of Mr. Hatch's present concern for the protection of his Company; and that the written contract would best disclose his present interest, bias or motive in accepting the blame before the jury in the present lawsuit. Such an inquiry was a proper subject of cross-examination and proof. *General Motors Corporation v. Simmons*, 558 S.W.2d 855 (Tex.1977); *Aguilera v. Reynolds Well Service, Inc.*, 234 S.W.2d 282 (Tex.Civ.App. —San Antonio 1950, writ ref'd). However, in this case, the trial Court permitted sufficient cross-examination on the subject. Regardless, if there was error, it did not cause the rendition of an improper judgment in this case and was harmless. Tex.R.Civ.P. 434.

The judgment of the trial Court is affirmed.