Charles W. DABERKO,
Plaintiff-Appellant,

American International Adjustment Co.,
Inc., Intervenor-Appellant,

v.

HEIL COMPANY, Defendant-Appellee.

No. 81–2285.

United States Court of Appeals,
Fifth Circuit.

July 30, 1982.

Rehearing and Rehearing En Banc
Denied Aug. 26, 1982.

Evans & Moses, Steven C. Barkley, Beaumont, Tex., for Daberko.

Edward J. Mahar, Houston, Tex., for American Intern. Adjustment Co.

Orgain, Bell & Tucker, David J. Kreager, Beaumont, Tex., for Heil Co.

Before GARZA, POLITZ and WILLIAMS, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

## I. FACTS

Charles W. Daberko was injured when he fell from the top of a large cylindrical trailer truck while unloading sulphur. The trailer was manufactured in 1974 by the Heil Company and sold to Robertson Tank Lines to be used as a special purpose MC 312 acid trailer. The primary means of loading the trailer was through a round dome lid located at the top rear of the trailer. The dome lid was secured by six lugs which had to be released in order to open the lid. When opened, the dome lid swung upward toward the front of the trailer. Heil installed catwalks along both sides of the trailer about six inches above mid-line. Handrails were provided along the edge of the dome lid guard. The operator was expected to stand on the catwalk and grasp the handrail with one hand while opening the dome lid with the other hand. When standing on the catwalk, the dome lid was approximately at waist level. The trailer was unloaded from the ground through a system of pressurized valves. Heil purposefully designed the trailer so that the operator would not climb on top.

Sometime thereafter, Reagent Chemical & Research, Inc., Daberko's employer, purchased the trailer from Robertson Tank Lines. Because Reagent intended to use the trailer to haul sulphur, a number of changes were made in the design. First, Reagent completely dismantled Heil's catwalk system. In its place, Reagent installed a new catwalk located on the top of the trailer and surrounded by a 14″ guardrail. Reagent altered the hinge point on the dome lid so that it would open toward the side of the trailer rather than toward the front. Because sulphur, unlike acid, is unloaded from the bottom by gravity, it was necessary for the dome lid and a topside valve to be opened during the unloading process to allow air to enter the tank as the sulphur drained from the bottom. To assist the operator in opening the dome for loading and unloading, Reagent installed a T-bar and attached it to the catwalk by means of a 20″ cable.

On April 16, 1979, Daberko drove this trailer loaded with sulphur from Port Arthur, Texas, to the Pennwalt Plant in Houston, Texas. He stopped the trailer in the sulphur unloading zone and climbed on top to start the unloading process. Daberko stood on the catwalk and opened the dome lid and the valve. He climbed down and then connected a hose from the trailer to the discharge hole. When the trailer had emptied, Daberko climbed back on top to shut off the valve. A few minutes later, he climbed onto the catwalk on top of the trailer again, this time to secure the dome lid. As he was walking on the catwalk, Daberko caught his foot on the T-bar cable.

He tripped and fell over the 14″ guardrail and onto the ground.

Daberko sustained a back injury in the fall. He underwent extensive surgery and his post-operative recovery was slow and painful. While in the hospital, Daberko developed epilepsy. The back injury aggravated a congenital condition, spondylolisthesis, causing Daberko additional pain. Daberko's back condition has decreased his prospects for many jobs, especially those in the trucking industry. At the time of trial, two years after the accident, Daberko was still unemployed.

Daberko sued the Heil Company alleging that the company was strictly liable for its defective design of the trailer.[1] Specifically, Daberko contended that Heil's failure to install a topside catwalk with 42″ guardrails rendered the trailer unreasonably dangerous and that this defect was a producing cause of his injuries. Heil denied liability on the grounds that the trailer was not unreasonably dangerous and that it had undergone substantial change when Reagent converted it into a sulphur trailer. Heil also raised the affirmative defense of voluntary assumption of the risk.

The case was tried before a jury. Heil moved for a directed verdict prior to the submission of the case to the jury, but the motion was denied. The court delivered a thorough charge to the jury in which it explained all the elements of a strict liability claim. The jury was instructed that the plaintiff had the burden of proving by a preponderance of the evidence (1) that at the time the trailer was designed and left the hands of the defendant it was in a defective condition unreasonably dangerous to the user; (2) that the trailer was expected to and did reach the user without substantial change in the condition in which it was sold; and (3) that the defective condition was a producing cause of the accident or injury. The terms "producing cause" and "unreasonably dangerous" were defined. Further, the court instructed the jury on the assumption of the risk defense and as well as the items to be considered in assessing Daberko's damages. The jury was instructed to render a general verdict stating only whether it found for plaintiff or defendant. The jury returned a verdict in favor of plaintiff Daberko and assessed damages in the amount of $333,000.00.

Heil then renewed its motion for directed verdict. The court granted Heil's motion[2] and made its own findings of fact and conclusions of law. The court found that the trailer as originally manufactured by Heil was not unreasonably dangerous and that the alterations made by Reagent were so substantial that the trailer lost its identity as a Heil product. Further, the court found that Daberko voluntarily assumed the risk of the fall. Judgment was entered accordingly.

In this appeal, Daberko contends that the court erred in refusing to enter judgment on the verdict because there was evidence of such quality and weight that reasonable minds could have arrived at different conclusions as to whether the Heil trailer was unreasonably dangerous, whether it was substantially changed, and whether Daberko assumed the risk of the accident. Heil argues in support of the judgment and raises two cross-points in the alternative. In their briefs and at oral argument, both parties' discussions centered around the issue of substantial change. Because we affirm the district court's conclusion that the Heil trailer was not defectively designed, we need not reach the issues of substantial change and assumption of the risk or Heil's cross-points.

1. The trailer was designed pursuant to instructions and specifications issued by Robertson Tank Lines, the original purchaser. Heil recognizes, however, that the fact that the design plan was Robertson's idea will not relieve it of liability if the design was defective.

2. After the jury rendered its verdict in Daberko's favor, Heil sought to renew its motion for directed verdict and it was this motion which the district court granted. Because the motion was made and granted subsequent to the verdict we will refer to it as a motion for judgment n.o.v. pursuant to Fed.R.Civ.P. 50(b), rather than one for directed verdict.

## II. THE APPLICABLE LAW

In 1967, by court decision, Texas adopted § 402A of the Restatement (Second) of Torts as the law governing strict liability of suppliers of defective products. *McKisson v. Sales Affiliates, Inc.*, 416 S.W.2d 787 (Tex.1967). Section 402A provides:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it was sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relationship with the seller.

To succeed on a § 402A theory, Daberko first had to prove that the trailer as originally manufactured by Heil was defective because it did not have a catwalk with a 42″ guardrail on top and that this defect rendered the trailer unreasonably dangerous to users. In the context of design choices, "defect" and "unreasonably dangerous" are synonymous. *Mitchell v. Fruehauf Corp.*, 568 F.2d 1139, 1142 n.1 (5th Cir. 1978).

"Unreasonably dangerous" has been defined by the Texas courts to mean "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases [the product], with the ordinary knowledge common to the community as to its characteristics." *Turner v. General Motors Corp.*, 584 S.W.2d 844, 849 (Tex.1979); *Gonzales v. Caterpillar Tractor Co.*, 571 S.W.2d 867, 869 (Tex.1978); *Rourke v. Garza*, 530 S.W.2d 794, 798 (Tex.

1975). *See also* Comment (i) to § 402A. A determination of unreasonable dangerousness necessarily entails a balancing of the utility of the product against the risk of harm. *Mitchell*, 568 F.2d at 1144 n.7; *Borel v. Fiberboard Paper Products Corp.*, 493 F.2d 1076, 1089 (5th Cir. 1973), *cert. denied*, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974); *Turner*, 584 S.W.2d at 851. This includes a consideration of whether additional safety features would raise the cost or diminish the utility of the product. *Helicoid Gage Division of American Chain & Cable Co. v. Howell*, 511 S.W.2d 573, 577 (Tex.Civ.App.—Houston 1974, writ ref'd n.r. e.). A manufacturer need not destroy the utility of its product to make the product safe. *Hagans v. Oliver Machinery Co.*, 576 F.2d 97, 101 (5th Cir. 1978). And the fact that the manufacturer might have designed a better, safer product does not necessarily mean that the product he did design was unreasonably dangerous. *Henderson v. Ford Motor Co.*, 519 S.W.2d 87, 93 (Tex. 1974).

A manufacturer must design a product which is not unreasonably dangerous for its intended and foreseeable uses. *Helene Curtis Industries, Inc. v. Pruitt*, 385 F.2d 841, 855 (5th Cir. 1967), *cert. denied*, 391 U.S. 913, 88 S.Ct. 1806, 20 L.Ed.2d 652 (1968); *General Motors Corp. v. Hopkins*, 548 S.W.2d 344, 349 (Tex.1977). Thus, the manufacturer of a knife is not liable when his product cuts someone who uses the knife as a toothpick. *Hopkins*, 548 S.W.2d at 349. The foreseeability of a particular deviation in the manufacturer's intended use of the product bears upon the issue of whether the product was unreasonably dangerous when manufactured and sold. *Id. See also* Comment (h) to § 402A (a product is not in a defective condition when it is safe for normal handling).

## III. WAS THE HEIL TRAILER UNREASONABLY DANGEROUS?

When it granted Heil's motion for judgment notwithstanding the verdict, the court issued specific findings and conclusions in support of its judgment. The court

found that the original Heil trailer was a special purpose trailer designed to haul pressurized hazardous liquids such as caustic or acid. As such, the operator was not required to get on top of the trailer to unload it. The court concluded that at the time it left Heil's control, the trailer was not unreasonably dangerous to potential users in that its utility "much outweighed any risk to the user." Order of July 16, 1981, p.3. Having reviewed the evidence, we hold that the court acted properly in entering judgment n.o.v. on behalf of Heil because "the facts and inferences point so strongly and overwhelmingly in favor of [Heil] that ... reasonable men could not [have arrived] at a contrary verdict," *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir. 1969), as to whether the Heil trailer was unreasonably dangerous.

Three witnesses testified concerning the condition of the Heil trailer. David Fellows, Director of Engineering of the Bulk Trailer Division at Heil, testified as an expert witness on behalf of the company. He described Heil's design of the trailer, including the catwalk system, and the reasons for the design. Fellows testified that the trailer was designed to carry caustic or acid. No insulation was necessary because the chemicals remained at temperatures below 100°. The dome lid atop the trailer was used for loading, but not for unloading, the chemicals. To enable the operator to reach the lid, Heil installed catwalks along the mid-line of the trailer and a handrail along the dome lid guard. The operator was expected to stand on the catwalk and hold the rail with one hand, and loosen the six lugs and open the lid with the other hand. Fellows testified that the position in which the operator stood when opening the lid—the three point hold—was a safe and steady one. The hinge point was located on the right hand side of the lid so that when opened, the lid swung upward and toward the front of the trailer. Although the operator had to lean across the lid to loosen the farthest lug, the position of the hinge point provided leverage and enabled the operator to stand away from the mouth of the lid while pulling it open.

When questioned about the location of the catwalk system, Fellows testified that it was placed on the side, rather than the top, for practical as well as safety purposes. First, Fellows explained, because of the position of the hinge point and the direction in which the lid opened, it was easier for the operator to stand at the side of the trailer, rather than on top, to open the lid. Had he stood atop the trailer, the operator would not have had the advantage of the leverage which enabled him to pull open the lid from the side. Furthermore, it was safer for the operator to stand on the side catwalk rather than on top of the trailer. In fact, Fellows emphasized repeatedly, the trailer was designed specifically to keep the operator off the top of the trailer.

Fellows also discussed the feasibility of installing a topside catwalk with a 42″ guardrail. He explained that that design would have diminished significantly the utility of the trailer. By itself, the trailer measured slightly over ten feet tall. If a 42″ guardrail were added, the trailer's height would be slightly over thirteen feet and six inches—the maximum truck height permitted on most highways. Also, many unloading stations were unable to accommodate trucks of that height. Folding or collapsable guardrails, in Fellows opinion, generally were unreliable and therefore too dangerous to be a viable alternative.

Charles Burnett, a Reagent employee, testified as to the condition of the trailer at the time it was purchased by his employer and the changes subsequently made. Burnett stated that when Reagent bought the trailer, it was an acid hauler. While it would be possible for the operator to stand on top while unloading the acid, this would be an unusual and unsafe practice, according to Burnett. In fact, Burnett explained, if Reagent had intended to use the trailer as an acid hauler, it would not have altered the design. Because Reagent needed a sulphur trailer, however, substantial changes had to be made. Once these changes were completed, Burnett concluded, the trailer became a different piece of equipment than that originally designed by Heil.

Plaintiff's expert witness, Dr. James Brennan, testified to the contrary concerning the safety of the Heil trailer in its original form. He stated that because the catwalk was located on the side of the trailer, the operator's face necessarily would hover over the dome lid. This was very dangerous, Brennan explained, because the operator might inhale toxic fumes. The absence of 42″ guardrails increased the danger because if the operator inhaled the fumes, he might stumble backward and, without a guardrail, he might fall to the ground. Brennan also testified that the dome lid weighed 35 pounds and would be hard to open from the side catwalk, thus forcing the operator onto the top. These facts led Dr. Brennan to conclude that the Heil trailer was unreasonably dangerous.

On cross-examination, however, the weaknesses in Dr. Brennan's testimony became apparent. First, he conceded that he never designed a trailer, loaded a trailer, or watched a trailer being loaded. In fact, Dr. Brennan had not seen the trailer in question. Further, he admitted that his statement concerning the dome lid's weight was merely a guess. He accepted counsel's assertion that the lid actually weighed 25 pounds and that with the benefit of leverage, the lid weighed only 12 pounds. Finally, Dr. Brennan conceded that it might be safer to unload the trailer from the ground rather than from the top.

We conclude that the evidence showed that the design of the Heil trailer was not unreasonably dangerous in light of its intended and foreseeable uses. The only evidence of dangerousness came from Dr. Brennan. His conclusion that the catwalk should have been located on top was based upon his unsupported opinion that an operator standing on the side catwalk might inhale fumes. However, there was no evidence that the operator's face actually hovered over the lid; in fact, the only witness to testify on this point, David Fellows, specifically stated that this was not true. Dr. Brennan admitted that he never observed anyone operate the dome lid. Dr. Brennan also testified that the weight of the lid made it difficult to open from the side and that a person standing on top would be in a better position to lift the lid. On cross-examination, however, he admitted that he did not know the actual weight of the lid and he finally conceded that, with leverage, its true weight was only 12 pounds. Thus, the factual basis of Dr. Brennan's conclusion virtually disintegrated.

The evidence clearly showed that the original Heil trailer was a special purpose product designed to meet the needs of a particular part of the trucking industry, acid and caustic hauling. As such, it was unnecessary for the operator to mount the trailer to unload it. The dome lid was hinged in such a way that the operator was required to stand on the side catwalk to open the lid. Heil designed the trailer specifically to keep the operator off the top. All the evidence showed that the trailer was safe when used as a caustic or acid hauler, which was its intended purpose.

■ Our inquiry does not end here, however, because a product must be safe for its foreseeable uses as well. In this case, it is clear that Daberko's climbing on top and Reagent's changing the design were not foreseeable uses which Heil should have guarded against. Heil had no reason to foresee that an operator would climb on top to unload the trailer. In fact, Heil specifically attempted to prevent this by placing a catwalk on the side and hinging the lid so that it could be manipulated easily from that catwalk. By designing the catwalk and hinge point as it did, Heil was instructing the operator to use the side catwalk and cautioning him *not* to mount the trailer. Heil cannot be held liable for an operator's express disregard of its purposeful design.

■ Daberko was on top of the trailer because that is where the changes in the trailer required him to be. Our inquiry then is whether Heil should have foreseen, and therefore guarded against, this use of the trailer. We must conclude that Heil should not have foreseen this deviation in use. Heil designed an acid-hauling trailer

that did not require the operator to climb on top to unload his cargo. It provided a safe and effective means for loading and unloading acid. When Reagent purchased the trailer for use as a sulphur hauler, it substantially altered Heil's design. Heil should not be required to have foreseen that a subsequent purchaser would remanufacture its trailer and change it from an acid hauler to a sulphur trailer and materially change the method of loading and unloading. Heil had no duty to design a convertible hauler.

### CONCLUSION

We hold that the trailer as originally manufactured by Heil was not unreasonably dangerous for its intended or foreseeable uses. Because proof that the product was unreasonably dangerous is an essential element of the plaintiff's case in a strict liability action, Daberko's failure to prove this issue defeats his claim. It is unnecessary to consider separately whether the change in the trailer made by Reagent was "substantial" within the meaning of Section 402A(1)(b) of the Restatement (Second) of Torts. Nor is it necessary to consider the defense of voluntary assumption of risk. The court below was correct in rendering judgment n.o.v.

AFFIRMED.