**Larry Joe COLVIN, Appellant,**

v.

**ROBERT E. McKEE, INC., and Red Steel Company, Appellees.**

No. 05–82–00958–CV.

Court of Appeals of Texas, Dallas.

Feb. 1, 1984.

Rehearing Denied May 8, 1984.

Jack B. Cowley, Donald G. Stanford, Dallas, for appellant.

Gregory E. Jensen, Russell W. Schell, Catherine A. Gerhauser, Grady Chandler, Dallas, for appellees.

Before STEPHENS, WHITHAM and STEWART, JJ.

STEPHENS, Justice.

This is a products liability case. Larry Joe Colvin was injured in a fall on a construction project in Sherman, Texas. He sued Robert E. McKee, Inc., the general contractor, on a theory of negligence, and Red Steel Company, a supplier of steel, on a theory of negligence and on strict liability. McKee joined D.R. Smith, Inc., and Smith & Long, Inc., as Colvin's employer and sub-contractor, seeking indemnity under a provision of the sub-contract. United States Fire Insurance Company intervened.

Before trial, summary judgment was granted D.R. Smith, Inc., and Smith & Long, Inc., against McKee. The case then came on for trial, and after plaintiff rested, the trial court granted defendants' motions for instructed verdict, and entered a take-nothing judgment against plaintiff in favor of each defendant. On appeal, all parties have settled except Colvin's claim against Red Steel Company.

Colvin contends that the trial court erred in instructing a verdict in favor of Red Steel because there was sufficient evidence: to establish a legal duty owed Colvin to supply structural steel conforming to the contracts and shop drawings; to establish a legal duty to Colvin to supply structural steel which was reasonably safe for its foreseeable use; to support the submission of Colvin's theories of negligence; to support the submission of proximate cause; to support the submission of strict liability against Red Steel; and to support the submission of producing cause, under Colvin's strict liability claim; and finally, that the trial court erred by denying the admission of a part of the testimony of a certain witness. We overrule all points of error and affirm the instructed verdict in favor of Red Steel.

The evidence shows that the accident occurred when Colvin, an iron worker, was setting a steel truss onto a concrete column while in a squatting position. He reached above his head to pull himself up from his squatting position and grabbed an I-beam, known as a purlin, which was positioned upright on the top of a truss. At the time he grabbed the purlin, he could not see its length nor determine whether or not it was welded to the truss. It was in fact not welded, it was eight or ten feet in length, and it weighed approximately eighty-eight pounds. When Colvin grabbed hold of the purlin, it failed to support his weight, and he fell. He contends, in support of his strict liability claim, that those purlins that were cut shorter than the lengths called for in the shop drawings, were defective products, merely because of their short lengths. In support of his negligence claim, he contends that by cutting the purlins shorter than the length called for in the shop drawings, Red Steel created a product unreasonably dangerous for its intended or foreseeable use.

Mr. Deering, owner of Red Steel, testified that Red Steel was the fabricator and supplier of the steel on the job in question; that when the order was received, he employed a draftsman or engineer to prepare the shop drawings, which determined the

different types of material to be used, the different sizes and lengths of the materials and the location of the welds. The shop drawings show that thirty A–1–A purlins were to be cut for delivery to the job, each one being the same length, forty-nine feet, eleven and one-fourth inches. A cutting order was prepared calling for thirty purlins of the length shown in the shop drawings. This was the only cutting order issued. Red Steel's shipment orders show that seven purlins were supplied, cut to the shop drawings specifications, and the rest were substantially shorter. It was shown that all purlins, when welded, would have spanned thirty truss members, but no explanation could be given as to why some of the purlins were made of multi-pieces. Deering identified a letter from his employee to McKee indicating that all purlins were to be in fifty and sixty foot lengths as far as possible. He further testified that he did not obtain the architect's approval to change the length of the purlins called for in the shop drawings; that he received no written approval of the general contractor, or any subcontractor, to change the length of the purlins, nor did he have any records indicating a request from anyone to supply purlins of any different length.

It is undisputed that the A–1–A purlins were to be attached to the top of the main roof trusses as spacers to separate the top of the trusses from the bottom of the roof, and that it was immaterial to the structural integrity of the building whether they were one continuous length or multi-length because they had no structural or weight bearing function. None of the steel as shipped was rejected, but was in fact installed.

It is uncontroverted that Colvin had never seen the shop drawings prior to the accident, had not relied on the shop drawings and did not know whether the shop drawings called for one continuous length or multi-piece purlins. It was also uncontroverted that Colvin personally unloaded the multi-piece purlins from the delivery truck, hoisted them onto the roof and actually positioned them atop the main trusses prior to his fall.

Colvin acknowledged that he may have placed the purlin on the truss approximately one week before the accident. He testified that the purlins would first be placed on the trusses on their side, that McKee would chalk a line down the truss to show the erectors where to place the purlins, that the welding crew would then come along, place the purlins upright and weld them. He stated that at the time of the accident the purlin was in an upright position, indicating that it was in position and welded to the truss. He further testified that he was required to use the purlin to pull himself upright.

## STRICT LIABILITY

Colvin argues, in two points of error, that a manufacturer of a product, which is defective and unreasonably dangerous to an ordinary user because of its design, or because such product is not reasonably fit for its intended or foreseeable uses, is liable for harm resulting from the use of such product. He would have us hold that a steel beam, otherwise sound, is a defective product merely because it is shipped to a construction site in a length shorter than the length shown on the shop drawings. This we decline to do. The record shows that steel of various lengths was ordered, and shipped. It is undisputed that the beams in question were in fact accepted by the general contractor and used for the purposes for which they were purchased. The fact that the steel, as delivered, was accepted and used in the construction of the building, contradicts the argument that the product was not reasonably fit for its intended or foreseeable use. The steel in question was shipped f.o.b.; it was accepted at the job site, unloaded and hoisted to the top of the main trusses by workers on the construction job. Colvin's expert witness testified that safety precautions, recognized in the industry, demanded that the steel be immediately welded or securely fastened to the structure when hoisted, and that compliance with this safety feature is the responsibility of the gener-

al contractor. It would indeed be a strained holding for us, in light of this evidence, to hold that the steel fabricator is charged with the foreseeability of a general contractor's negligence in the handling of its product, and thus extend liability to the fabricator. In order to extend liability to the manufacturer, it must also be shown that the defective product was defective when it left the hands of the manufacturer. *See Rourke v. Garza*, 530 S.W.2d 794, 798 (Tex.1975). The expert witness agreed that the length of the steel in question did not, in and of itself, make the product unreasonably dangerous, and that the unreasonably dangerous aspect was created when the steel was hoisted to the truss, and left there in an insecure manner. We conclude that Red Steel is not strictly liable.

## NEGLIGENCE

Four points of error argue that there was sufficient evidence to support a finding that Red Steel owed him a duty to supply steel complying with the contracts and shop drawings, which was reasonably safe for its foreseeable use; that such duty was breached; and that such breach was the proximate cause of his injuries.

Colvin's expert's testimony shows that the steel was mishandled when received on the job, in that it was hoisted to the truss and left there in an unsecured state. Foreseeable use, as that term is used in these cases, does not encompass the foreseeability of injuries sustained when the product is mishandled by a user. *See General Motors Corporation v. Hopkins*, 548 S.W.2d 344, 351 (Tex.1977) [partially overruled on other grounds, *Turner v. General Motors Corporation*, 584 S.W.2d 844 (Tex.1979)]. We decline to hold that Red Steel's actions in cutting the steel to the length that it did, created an unreasonably dangerous product for its foreseeable use, and consequently, we hold that Red Steel was not negligent. Colvin called an expert witness to testify on his behalf, who was shown to be a professional engineer who was licensed by the State of Texas and by the State of Illinois. He

complains that part of his testimony was erroneously excluded. We have examined the bill as to the excluded testimony, and conclude, in light of our holding, that the exclusion of such testimony was harmless.

The judgment of the trial court is affirmed.