NO. 07-00-0371-CR



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL A



NOVEMBER 14, 2001



______________________________




DAVID EARL JOHNSON JR., APPELLANT



V.



THE STATE OF TEXAS, APPELLEE




_________________________________



FROM THE 64TH DISTRICT COURT OF SWISHER COUNTY;



NO. B3222-9907CR; HONORABLE JACK R. MILLER, JUDGE



_______________________________



Before BOYD, C.J., and REAVIS and JOHNSON, JJ.

 In this appeal, appellant David Earl Johnson Jr. challenges his conviction of
involuntary manslaughter and the resulting jury-assessed sentence of ten years
confinement in the Institutional Division of the Department of Criminal Justice. In pursuing
that challenge, appellant presents five points of asserted error in which he posits: 1) the
evidence was legally insufficient to show that he recklessly caused the death of the minor
child Anthony Lynn Culfer (Anthony); 2) the trial court not only abused its discretion by
submitting the question of involuntary manslaughter to the jury, but the evidence is also
factually insufficient to support a finding that he caused the death of the victim by
smothering him; 3) by submitting the question of involuntary manslaughter, the trial court
abused its discretion and deprived him of the due course of law guaranteed by article 1,
section 19 of the Texas Constitution; 4) by submitting the question of involuntary
manslaughter to the jury, the trial court abused its discretion and denied him due process
"because the federal standard is the minimal standard required to enforce the U. S. Const.
Fifth Amendment"; and 5) by submitting the question of involuntary manslaughter, the trial
court abused its discretion and denied him the due process to which he was entitled "under
the U.S. Const. Fourteenth Amendment, applying the Fifth Amendment to the States." 
Disagreeing that reversible error exists, we affirm the judgment of the trial court.

 The nature of appellant's challenges is fact intensive in character and requires us
to recount pertinent portions of the trial evidence. On March 20, 1989, at approximately
8:48 p.m., fourteen-month-old Anthony was brought to the emergency room of the Tulia
Hospital by Ronda Fore, his mother. Ronda was accompanied by appellant, her boyfriend. 
Ronda reported to hospital personnel that Anthony had been suffering from a runny nose. 
At the time of Anthony's arrival, he had no pulse or respiration signs. The emergency
room physician, Dr. William Childress, and Edith Gilliam, the nurse on duty at the time,
noticed Anthony's face was blue and his hands and feet were cold. They concluded he
was dead. Because Dr. Childress thought Anthony had been dead for somewhere around
an hour, he requested Tulia Municipal Judge Janet Freemen to order an autopsy to
determine the cause of death.

 Tulia police officers James Hart and Donny Harlan were dispatched to the hospital
and took some pictures of the dead child. They noticed an abrasion on Anthony's
forehead and some type of mark above his lip. Officer Harlan, the senior officer present,
was told by Judge Freeman not to question anyone until after an autopsy was performed. 

 Until the evening of March 20, 1989, Anthony had basically been a healthy child. 
Some two weeks before that date, Anthony had an ear infection treated by his doctor. The
doctor had not noted any respiratory infection at that time. On the day of his death, as was
usually done while his mother worked, Anthony was taken to a Tulia day nursery by his
mother. The day care workers at the nursery observed that he seemed healthy and happy,
did not show any ascertainable signs of illness, and was not injured while there. The
workers were surprised to hear of Anthony's death because of his apparent good health. 
The child's aunt, Tina Wright, had seen him at play on March 20 and opined that he was
acting normally with no signs of illness.

 On March 21, 1989, Dr. Ralph Erdmann performed an autopsy on the child, which
had been ordered by Swisher County Justice of the Peace Marie Rucker. In the course
of the autopsy, Erdmann notice a slight abrasion on Anthony's forehead and some kind of
mark on his lip, which was slightly swollen. Erdmann found that the child's lungs were
somewhat abnormal and removed portions to be microscopically examined. As a result
of his examination, Erdmann concluded that Anthony died of a mild case of acute
interstitial pneumonitis associated with acute septic and toxic shock. Thus, he found that
Anthony died of natural causes.

 In 1993, Ronda appeared at the Tulia police station and made a statement to Officer
Donald Dunn implicating appellant in Anthony's death. As a result of that statement, the
investigation into Anthony's death was reopened. She gave two sworn statements to Dunn
which were some two weeks apart. In the first of those statements, she averred that
appellant smothered Anthony with a pillow and, in the other, that appellant had smothered
the child with his hand. Because of the differences in the statements, Dunn continued his
investigation. In the course of the investigation, on August 18, 1993, appellant gave a
handwritten statement to Amarillo Police Officer Chance Coberly dealing with the events
of the evening Anthony died. Although appellant said he was at work after 6:40 p.m., was
not present at the home during the critical times on the night in question and did not return
until Anthony was found lifeless, his work records did not show that he was at work after
6:40 p.m. After this investigation, the case was submitted to the Swisher County Grand
Jury in 1993, but no indictment was returned. The only autopsy available in 1993 was the
one performed by Erdmann.

 In 1998, Tulia Police Chief Jimmy McCaslin asked the Texas Rangers to determine
if further investigation was warranted. Texas Ranger Dwayne Williams obtained the case
file, and interviewed a number of witnesses. He then obtained an order to exhume the
body from Justice of the Peace Rucker. She then ordered Tarrant County Medical
Examiner Marc Krouse to conduct another autopsy.

 Doctor Krouse testified that he had performed between 9,000 and 10,500 autopsies. 
During the course of those autopsies, he had examined about 1600 mummified or
decomposed bodies. Prior to conducting an autopsy on Anthony's body, the doctor
reviewed the records of Dr. Erdmann's autopsy. In examining the photographs taken in
connection with Erdmann's autopsy, he took particular notice of the abrasion above the
upper lip slightly to the left of the child's midline. He opined that it was an abrasion that
was caused either by scraping or crushing of the skin and it occurred close enough to the
time of Anthony's death that little swelling had developed. He also noted that there was
a foamy material in the child's mouth, which he believed was the product of pulmonary
edema, which was consistent with a finding of asphyxia. Asphyxia, he explained, was a
fatal deprivation of oxygen to the brain and heart. The doctor also characterized the
injuries as being consistent with the use of some sort of force against the face of the child.

 Dr. Krouse investigated Anthony's medical records kept by his treating doctor and,
considering the testimony as to his condition in the time immediately prior to his death,
disagreed with Erdmann's conclusion as to the cause of death. It was his belief that if
Erdmann's conclusion was correct, there would have been more evidence of a shortness
of breath. As a result of his autopsy, he recommended that the cause of death be changed
to suffocation and the cause of death as homicide.

 Doctor William Anderson, a deputy chief medical examiner in Orlando, Florida, also
testified that what Dr. Erdmann characterized as interstitial pneumonia was "acute lung
injury, a deoxygenation of the lungs." In his view, Anthony died of "respiratory and acute
respiratory failure. Nothing that had been hanging around for days as a pneumonia might,
but something that's very acute." He opined that what is described as interstitial
pneumonia "is actually not an infection thing at all, but a response to an injury." This type
of injury, he said, "would be consistent with something, among one of the possibilities
something being placed over the mouth nose area." Doctor Anderson did not believe that
Anthony's death was caused by a virus because the response of his body that was
described by Dr. Erdmann could not be the result of such an infection.

 Ronda testified that on the day of his death, she was working at a nursing home. 
Appellant's mother had picked up Anthony from day care and, after she got off work,
Ronda picked up Anthony, his two-year-old sister Marlene, and his four-year-old brother,
Brandon. When she got home, she began preparing dinner and appellant came home. 
Anthony was "fussy," so she put him down and gave him a bottle to try to quiet him, but "he
didn't want it." Ronda said that appellant was "mad" because Anthony was being noisy
and appellant wanted to watch Star Trek, his favorite TV show. Appellant put a pillow over
Anthony's face while Anthony was screaming and crying. Ronda averred that she told
appellant to stop and he did so for a moment but then "started back up." Ronda then went
over and removed the pillow while Anthony gasped for air. Ronda then returned to the
kitchen. While she was there she heard Anthony scream a couple of times and then there
was silence. 

 Sometime after that, Brandon came into the kitchen and told her that something was
wrong with Anthony. Ronda ran into the living room and saw Anthony lying on the couch
with his arms above his head and his face was blue. She called appellant, who was
outside, and he came into the room and started doing CPR in an attempt to revive
Anthony. Ronda said that appellant continued the CPR for five or so minutes without
success, so she told appellant they needed to take Anthony to the hospital. Instead of
driving directly to the hospital, they took the other two children by Ronda's sister's house,
dropped them off and then went to the hospital. When they arrived there, she was told the
child was dead. She was upset and asked appellant what had happened. Appellant
replied that he did not know and that it was better left alone.

 When cross-examined, Ronda admitted she told appellant's attorney a week before
the trial that she had not seen appellant put a pillow over Anthony's face. She also
admitted that when she was questioned at the hospital about Anthony's death, she did not
tell anyone that she saw appellant place a pillow over the child's mouth. She also admitted 
she did not go to the police until 1993 after she dreamed she saw appellant putting a pillow
over Anthony's face. In her 1993 statement, she said she saw appellant place the pillow
over Anthony's face and she did not make him quit. Again, in 1993, about three weeks
after the first statement, she gave the police another statement in which she said she did
not remember a pillow, but that appellant had used his hand to cover Anthony's mouth. 
In 1998, she gave another statement in which she again said appellant used a pillow and
she tried to stop him. The grand jury did not return an indictment in 1993, but in 1998,
after an additional investigation, the instant prosecution was commenced.

 Marlene Ballard testified that at the time of the death, she was two years old, but
she remembered seeing appellant place a pillow over Anthony's mouth and when the
pillow was removed, he was not moving.

 Appellant presented several character witnesses, who stated that both Ronda and
Marlene had bad reputations for being truthful. He also presented the testimony of Dr.
Sparks Veasey, a forensic pathologist. Although Veasey admitted he was aware of reports
that appellant placed his hand over the mouths of Anthony and another child and held it
over them until they quit crying, after examining the autopsy reports and the police reports,
he averred that he could not determine the cause of Anthony's death.

 We have listed the relevant evidence in this case in somewhat exhaustive detail. 
In determining whether the evidence supports the jury verdict, we must bear in mind that
it is the jury's exclusive function to determine the credibility of the witnesses and the weight
to be given their testimony, and in doing so, they are entitled to consider all the
circumstances surrounding the death. Our review of the evidence satisfies us that a
reasonable jury could conclude that appellant recklessly caused Anthony's death by
covering his mouth in an attempt to quiet him, and that conclusion would not be so against
the overwhelming weight of the evidence as to be manifestly unjust. Appellant's first two
points are overruled.

 With regard to the remainder of appellant's points, he made no trial objection to the
court's action in including a charge on involuntary manslaughter in his instructions to the
jury. Indeed, with the exception of expressing his opinion that the State should be required
to elect whether it was going with a charge that appellant smothered Anthony with a pillow
or by other means unknown to the grand jury, trial counsel opined that the charged "looks
fine to us." When a defendant requests or does not object to the inclusion of a lesser-included offense, such as manslaughter in this case, a defendant has accepted the benefit
of that instruction and is estopped from complaining on appeal that the evidence failed to
establish all the elements of the lesser offense. See State v. Lee, 818 S.W.2d 778, 781
(Tex.Crim.App. 1991), overruled on other grounds, Moore v. State, 969 S.W.2d 4, 10
(Tex.Crim.App. 1998); see also State v. Yount, 853 S.W.2d 6, 9 (Tex.Crim.App. 1993). 

 Additionally, even if the question was preserved for appellate review, the trial court
did not err in submitting the manslaughter charge. The evidence indicating that appellant
was only trying to quiet the child so he could watch his program, together with the fact that
he immediately performed CPR on the child after he was found to be unconscious, could
reasonably be interpreted by the jury as indicating the death was caused recklessly. 
When evidence from any source raises an issue that a lesser-included offense may have
been committed, it is proper to charge the jury on that offense. Ormsby v. State, 600
S.W.2d 782, 785 (Tex.Crim.App. 1979); Moore v. State, 574 S.W.2d 122, 124
(Tex.Crim.App. 1978). Either party may insist that a charge on a lesser-included offense
be given in a proper case. Pennington v. State, 644 S.W.2d 64, 67 (Tex.App.-Austin
1982), aff'd, 697 S.W.2d 387 (Tex.Crim.App. 1982). In determining whether a charge on
a lesser-included offense should be given, the questions confronting the court are: 1) is
the lesser-included offense included within the proof necessary to establish the charged
offense, and is there any evidence that if the defendant is guilty, he is only guilty of the
lesser offense. Royster v. State, 622 S.W.2d 442, 446 (Tex.Crim.App. 1981) (opinion on
reh'g). The evidence in this case meets both those requirements. Accordingly, appellant
was not denied any of his federal or state constitutional rights by the submission of the
manslaughter question to the jury. Appellant's points three through five are overruled.

 In sum, all of appellant's points are overruled and the judgment of the trial court is
affirmed.


 John T. Boyd

 Chief Justice


Do not publish.



an style="text-decoration: underline">Kelly, 71 S.W.3d at 422.
Applicable Law
          The elements of a negligence claim are duty, breach of that duty, and damages
proximately caused by the breach of duty. See Doe v. Boys Clubs of Greater Dallas, Inc.,
907 S.W.2d 472, 477 (Tex. 1995). 
          In assessing whether a duty exists, a reviewing court should consider factors such
as the risk, foreseeability, and likelihood of injury weighed against the social utility of the
actor’s conduct; the magnitude of the burden in guarding against injury; and the
consequences of placing the burden on the defendant. Greater Houston Transp. Co. v.
Phillips, 801 S.W.2d 523, 525 (Tex. 1990). When the defendant distributes a dangerous
article or agent, the defendant owes the public the degree of care proportionate to and
commensurate with the dangers involved. McAfee v. Travis Gas Corp., 137 Tex. 314, 153
S.W.3d 442, 447 (1941). When the defendant distributes a dangerous article or agent, it
owes a nondelegable duty to take all reasonable precautions to effectually protect third
parties from injury. Loyd v. Herrington, 143 Tex. 135, 182 S.W.2d 1003, 1004 (1944).



Analysis
          In its motions, Wylie contended that Huffaker could produce no evidence that either
T&B, Ltd., or Wylie LP Gas, in its capacity as General Partner of T&B, Inc., were proper
parties to this suit. According to the deposition transcript of Tipton, T&B, Ltd., owns the
real property and some of the equipment that Wylie LP Gas leases. Wylie LP Gas is the
General Partner of T&B, Ltd., and holds a one percent ownership interest in T&B, Ltd. 
However, this is all of the evidence presented in regard to these two defendants. Huffaker
presented no evidence nor even alleges how T&B, Ltd., or Wylie LP Gas, as General
Partner of T&B, Ltd., owed a duty to Huffaker, breached that duty, or caused the damages
suffered by Huffaker as a result of the breach. Therefore, we affirm the trial court’s no-evidence summary judgment as it relates to claims against T&B, Ltd., and Wylie LP Gas,
in its capacity as General Partner of T&B, Ltd. See Tex. R. Civ. P. 166a(i); Ford Motor Co.,
135 S.W.3d at 600. 
          As to Huffaker’s claims against Wylie LP Gas, individually, Wylie contends that
Huffaker is unable to present more than a scintilla of evidence to raise a genuine issue of
material fact as to the duty, or standard of care, Wylie LP Gas owed to Huffaker or that
Wylie LP Gas breached that duty. 
          Expert testimony is necessary when the alleged negligence is of such a nature as
not to be within the experience of a layperson. Turbines, Inc. v. Dardis, 1 S.W.3d 726, 738
(Tex.App.–Amarillo 1999, pet. denied) (citing Roark v. Allen, 633 S.W.2d 804, 809 (Tex.
1982)). The expert testimony must establish both the standard of care and the violation
of that standard. Id. However, even expert testimony that a particular action would be
prudent, beneficial, recommended, or desirable cannot be taken as evidence of the
standard of care or that the failure to take the action constituted a breach of that standard. 
Id. at 739.
          In the present case, Huffaker provided no expert testimony as to any of the theories
of liability asserted in his live pleading. Thus, we must analyze each of Huffaker’s theories
of liability and the evidence presented as to each to determine whether a layperson would
be able to ascertain the applicable standard of care in the absence of expert testimony.
          Huffaker contends that Wylie LP Gas was negligent in the manner in which it stored
propane tanks at its facility. In support of this theory, Huffaker offered the testimony of
Tipton that, at the time of the fire, Wylie LP Gas was storing 11,000 full 20 pound propane
tanks at its facility. This factual testimony provides no insight into what the applicable
standard of care would have been for Wylie LP Gas. In fact, the only evidence relating to
the manner of storage of the propane tanks was Tipton’s testimony that the tanks were
stored in a manner that did not violate any rule or regulation of the Texas Railroad
Commission and that Wylie LP Gas took the additional step of using dividers to ensure that
the tanks did not touch one another, even though such a step was not required by any law. 
As such, we do not find the evidence sufficient to allow an ordinary layperson to conclude
what the applicable standard of care was in regard to Wylie LP Gas’s storage of its
propane tanks nor that Wylie LP Gas breached this standard. 
          Huffaker also contends that Wylie LP Gas was negligent in failing to properly
maintain, handle, and inspect the propane tanks in its storage. In support of this
contention, Huffaker cites Bridges’s testimony that there were times when employees of
Wylie LP Gas did not properly check the tanks for leaks. However, Bridges also testified
that he began working for Wylie LP Gas sometime in the late 1980s. There is no evidence
of the frequency with which employees failed to properly check the tanks and, further, there
is no evidence as to how often a reasonable propane dealer would be expected to inspect
the tanks in its storage. While the testimony does establish that Bridges felt that there
were times when proper inspections were not performed, because the basis for his opinion
is not shown, we cannot conclude what the applicable standard of care was in regard to
Wylie LP Gas’s maintenance, handling, and inspection of the tanks nor does the evidence
raise a genuine issue of fact about that standard having been breached. 
          Huffaker contends that Wylie LP Gas was negligent in its filling of the propane
tanks, particularly in that it would overfill the tanks which would then require that some of
the liquid propane gas be bled off. Huffaker cites testimony of both Rebber and Bridges
that there were times when tanks would be overfilled and the tanks would then have to be
bled off. However, nothing in this testimony or in any evidence offered by Huffaker
establishes that the applicable standard of care would be that no tanks ever be overfilled
or that, if a tank was overfilled, that it should not be bled off. Because the filling of liquid
propane gas tanks lies beyond the experience of an ordinary layperson, we conclude that
Huffaker has provided no evidence of what the applicable standard of care is as it relates
to filling propane tanks and, even more so, whether bleeding off the excess propane in an
overfilled tank falls below the applicable standard of care. 
          Huffaker also contends that Wylie LP Gas failed to implement and monitor proper
safety procedures. The evidence that Huffaker relies on in support of this contention is that
Wylie LP Gas had not held fire drills, three employees were performing their work without
supervision, and that there were times when employees did not properly check for leaks
in the stored tanks. However, there is no evidence that a reasonable liquid propane dealer
would conduct fire drills or that, had Wylie held fire drills, the fire would have been
contained. Further, there is no indication why employees needed to be supervised at all
times or how the lack of supervision of these particular employees fell below the applicable
standard of care. As to the failure to properly inspect the stored tanks, that issue was
addressed above. Thus, there was no evidence presented that would allow a reasonable
layperson to identify the applicable standard of care in relation to Wylie LP Gas’s safety
procedures nor that Wylie LP Gas’s safety procedures fell below that standard.
          Finally, Huffaker contends that Wylie LP Gas knowingly allowed smoking in close
proximity to the propane tanks. Rebber testified that he has seen employees “walk right
to the gate [of Wylie LP Gas’s facility] and throw a cigarette down” and that it “was
possible” that an employee was smoking just east of the propane tank storage area where
the fire started.


 Bridges testified that he was aware that the fire marshal found cigarette
butts inside the yard and that the employees were allowed to smoke inside the confines
of the gate of Wylie LP Gas’s facility. However, because there was no evidence offered
of the proximity of the area where smoking occurred to the propane tanks, we would have
to speculate that it was an unsafe distance. While we believe that a layperson could
conclude that smoking in close proximity to liquid propane gas tanks was a breach of the
applicable standard of care, Huffaker offered no evidence to raise a genuine issue of
material fact as to how close to the propane tanks employees were smoking. 
          Because there is no expert evidence establishing the applicable standard of care
owed by Wylie LP Gas and because a layperson would not be able to determine the
applicable standard of care in regard to the theories of liability asserted by Huffaker, we
conclude that the trial court was correct in granting Wylie’s no-evidence summary judgment
motions.
Conclusion
          For the foregoing reasons, we affirm the trial court’s judgment.
 
                                                                           Mackey K. Hancock

                                                                                    Justice